

This Instrument Prepared By:

After Recording Return To:
FIRST OHIO BANC & LENDING, INC.
6100 ROCKSIDE WOODS BLVD SUITE 100
INDEPENDENCE, OHIO

9/13/07
Rn

Doc#:  0717140047 Fee: $54.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 06/20/2007 09:39 AM Pg: 1 of 19

—————— [Space Above This Line For Recording Data] ——————

Loan Number: ▓▓▓▓▓    **MORTGAGE**

MIN: ▓▓▓▓▓▓▓▓▓▓

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11,
13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)  "Security Instrument" means this document, which is dated   MAY 25, 2007                , together
with all Riders to this document.
(B)  "Borrower" is   MONA ZEPHIR *M2*
*asingle woman*

Borrower is the mortgagor under this Security Instrument.
(C)  "MERS" is  Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns.  MERS is the mortgagee under this Security
Instrument.  MERS is organized and existing under the laws of Delaware, and has an address and telephone number
of P.O. Box 2026, Flint, MI  48501-2026, tel. (888) 679-MERS.
(D)  "Lender" is   FIRST OHIO BANC & LENDING, INC.

Lender is a   CHIO BANKING CORPORATION                                              organized
and existing under the laws of  OHIO
Lender's address is  6100 ROCKSIDE WOODS BLVD SUITE 100, INDEPENDENCE,
OHIO 44131

(E)  "Note" means the promissory note signed by Borrower and dated   MAY 25, 2007
The Note states that Borrower owes Lender  THREE HUNDRED EIGHTY-FOUR THOUSAND AND
00/100                          Dollars (U.S. $  384,000.00          ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than
JUNE 1, 2037
(F)  "Property" means the property that is described below under the heading "Transfer of Rights in the Property."



ILLINOIS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS          DocMagic *eFarms* 800-649-1362
Form 3014 1/01                                 Page 1 of 14                                      www.docmagic.com

EXHIBIT A

LEGAL DESCRIPTION

Legal Description:  LOT 12 IN BLOCK 7 IN ATHENIA PARK, BEING A SUBDIVISION IN THE NORTHEAST 1/4 OF SECTION 24, TOWNSHIP 35 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN ACCORDING TO THE PLAT THEREOF RECORDED OCTOBER 23, 1956, AS DOCUMENT 16734380, IN COOK COUNTY, ILLINOIS.

Permanent Index #'s:

Property Address: 20717 Sparta Court, Olympia Fields, Illinois 60461

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider ☐ Planned Unit Development Rider
☐ Balloon Rider ☐ Biweekly Payment Rider
☐ 1-4 Family Rider ☐ Second Home Rider
☐ Condominium Rider ☐ Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the

COUNTY of COOK
[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]

ILLINOIS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3014 1/01                               Page 2 of 14

DocMagic eⓇⒻⓄⓇⓂⓈ 800-649-1362
www.docmagic.com

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS
EXHIBIT "A".

which currently has the address of
20717 SPARTA COURT
[Street]

OLYMPIA FIELDS                 , Illinois    60461    ("Property Address"):
[City]                                       [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements,
appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be
covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."
Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security
Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors
and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose
and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling
this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right
to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of
record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject
to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with
limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1.    **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall
pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late
charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due
under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other
instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid,
Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in
one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check,
treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured
by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other
location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return
any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender
may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights
hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not
obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of
its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds
until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of
time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be
applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim

ILLINOIS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3014 1/01                                Page 3 of 14                        DocMagic *eFormss* 800.649.1362
www.docmagic.com

which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.  **Application of Payments or Proceeds.**  Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority:  (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3.  Such payments shall be applied to each Periodic Payment in the order in which it became due.  Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge.  If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.  Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Funds for Escrow Items.**  Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for:  (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10.  These items are called "Escrow Items."  At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.  Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section.  Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount.  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA.  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank.  Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA.  Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds.  Borrower and Lender can agree

in writing, however, that interest shall be paid on the Funds.  Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA.  If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments.  If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  **Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  **Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.  Lender may require Borrower to pay, in connection with this Loan, either:  (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee.  Lender shall have the right to hold the policies and renewal certificates.  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices.  If Borrower obtains any

form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   Occupancy.   Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   Preservation, Maintenance and Protection of the Property; Inspections.   Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   Borrower's Loan Application.   Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.   **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

11.  **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction:  (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.  "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate

as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's

address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will

state the name and address of the new Loan Servicer, the address to which payments should be made and any other
information RESPA requires in connection with a notice of transfer of servicing.  If the Note is sold and thereafter
the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations
to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed
by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual
litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that
alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument,
until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements
of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such
notice to take corrective action.  If Applicable Law provides a time period which must elapse before certain action
can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of
acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given
to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action
provisions of this Section 20.

    21.  Hazardous Substances.  As used in this Section 21:  (a) "Hazardous Substances" are those substances
defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances:
gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents,
materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal
laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection;
(c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in
Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or
otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances,
or threaten to release any Hazardous Substances, on or in the Property.  Borrower shall not do, nor allow anyone else
to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an
Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a
condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the
presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized
to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to,
hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other
action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance
or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not
limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any
condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the
Property.  If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that
any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall
promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any
obligation on Lender for an Environmental Cleanup.

        **NON-UNIFORM COVENANTS.**  Borrower and Lender further covenant and agree as follows:

    22.  Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following
Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under
Section 18 unless Applicable Law provides otherwise).  The notice shall specify: (a) the default; (b) the action
required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by
which the default must be cured; and (d) that failure to cure the default on or before the date specified in the
notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial
proceeding and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after
acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other
defense of Borrower to acceleration and foreclosure.  If the default is not cured on or before the date specified

ILLINOIS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3014 1/01                                                    Page 11 of 14                    DocMagic *eFormes* 800-649-1362
                                                                                                   www.docmagic.com

in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

25. **Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
MONA ZEEHIR                -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

Witness:                        Witness:

_____       _____

——————————————— [Space Below This Line For Acknowledgment] ———————————————

State of Illinois

County of  COOK

The foregoing instrument was acknowledged before me this    5\25\07

by   MONA ZEPHIR

"OFFICIAL SEAL"
Barbara Prince
Notary Public, State of Illinois
My Commission Exp. 09/10/2009

Signature of Person Taking Acknowledgment

Title

(Seal)

Serial Number, if any

ILLINOIS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3014 1/01                                     Page 14 of 14

DocMagic *€*Forms* 800-649-1362
www.docmagic.com

Loan Number: ▇▇▇▇▇

# FIXED/ADJUSTABLE RATE RIDER

### (LIBOR One-Year Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this 25th  day of MAY
2007  . and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of
Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower")
to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to FIRST OHIO BANC &
LENDING, INC., AN OHIO BANKING CORPORATION
("Lender") of the same date and covering the property described in the Security Instrument and located at:

20717 SPARTA COURT, OLYMPIA FIELDS, ILLINOIS 60461
[Property Address]

THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE
TO AN ADJUSTABLE INTEREST RATE.   THE NOTE LIMITS THE AMOUNT
BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME
AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A.   ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial fixed interest rate of       6.875 %.  The Note also provides
for a change in the initial fixed rate to an adjustable interest rate, as follows:

## 4.   ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A)  Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the 1st   day
of  JUNE, 2012                          , and the adjustable interest rate I will pay may change
on that day every 12th month thereafter.  The date on which my initial fixed interest rate changes to an
adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change
Date."

### (B)  The Index
Beginning with the first Change Date, my adjustable interest rate will be based on an Index.  The
"Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the
London market ("LIBOR"), as published in *The Wall Street Journal*.  The most recent Index figure available
as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon
comparable information.  The Note Holder will give me notice of this choice.

MULTISTATE FIXED/ADJUSTABLE RATE RIDERNWSJ One-Year LIBOR
Single Family!nFannie Mae MODIFIED INSTRUMENT
Form 3187  6/01                          Page 1 of 4

*DocMagic* ☎ *800-649-1362*
*www.docmagic.com*

**(C)  Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding
TWO AND 750/1000                              percentage points (   2.750     %) to the
Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one
percentage point (0.125%).  Subject to the limits stated in Section 4(D) below, this rounded amount will be
my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to
repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my
new interest rate in substantially equal payments.  The result of this calculation will be the new amount of
my monthly payment.

**(D)  Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than
11.875 % or less than       2.750  %.  Thereafter, my adjustable interest rate will never
be increased or decreased on any single Change Date by more than TWO AND 000/1000
                            percentage points from the rate of interest I have been paying for the preceding
12 months.  My interest rate will never be greater than        11.875 %.

**(E)  Effective Date of Changes**

My new interest rate will become effective on each Change Date.  I will pay the amount of my new
monthly payment beginning on the first monthly payment date after the Change Date until the amount of my
monthly payment changes again.

**(F)  Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to
an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any
change.  The notice will include the amount of my monthly payment, any information required by law to be
given to me and also the title and telephone number of a person who will answer any question I may have
regarding the notice.

**B.    TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1.    Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms
stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.  As** used in this Section
18, "Interest in the Property" means any legal or beneficial interest in the Property, including,
but not limited to, those beneficial interests transferred in a bond for deed, contract for deed,
installment sales contract or escrow agreement, the intent of which is the transfer of title by
Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or
if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred)
without Lender's prior written consent, Lender may require immediate payment in full of all
sums secured by this Security Instrument.  However, this option shall not be exercised by
Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MULTISTATE FIXED/ADJUSTABLE RATE RIDERNWSJ One-Year LIBOR
Single FamilylFannie Mae MODIFIED INSTRUMENT
Form 3187 6'01                    Page 3 of 4

DocMagic €?Ram≋s 800-649-1362
www.docmagic.com

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
MONA ZEPHIR                  -Borrower                                    -Borrower


_____ (Seal)          _____ (Seal)
                            -Borrower                                    -Borrower


_____ (Seal)          _____ (Seal)
                            -Borrower                                    -Borrower

MULTISTATE FIXED/ADJUSTABLE RATE RIDER\WSJ One-Year LIBOR
Single Family\Fannie Mae MODIFIED INSTRUMENT
Form 3187  6/01                          Page 4 of 4

*DocMagic* 800-649-1362
www.docmagic.com



CERTIFIED COPY
OF ORIGINAL
DATE/INITIALS

*Zephir*

MIN: ████                                    Loan Number: ████

## FIXED/ADJUSTABLE RATE NOTE

(LIBOR One - Year Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN
ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE
INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST
PAY.

MAY 25, 2007            INDEPENDENCE            OHIO
[Date]                     [City]                [State]

    20717 SPARTA COURT, OLYMPIA FIELDS, ILLINOIS 60461
                        [Property Address]

### 1.    BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $384,000.00        (this amount is
called "Principal"), plus interest, to the order of Lender.  Lender is FIRST OHIO BANC &
LENDING, INC., AN OHIO BANKING CORPORATION
I will make all payments under this Note in the form of cash, check or money order.
    I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who
is entitled to receive payments under this Note is called the "Note Holder."

### 2.    INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest
at a yearly rate of      6.875 %. The interest rate I will pay may change in accordance with Section 4 of this
Note.
    The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after
any default described in Section 7(B) of this Note.

### 3.    PAYMENTS

(A) Time and Place of Payments
I will pay principal and interest by making a payment every month.
    I will make my monthly payments on the   1st   day of each month beginning on  JULY 1                .
2007   . I will make these payments every month until I have paid all of the principal and interest and any other
charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled
due date and will be applied to interest before Principal. If, on JUNE 1, 2037                . I still owe
amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
    I will make my monthly payments at 6100 ROCKSIDE WOODS BLVD SUITE 100,
INDEPENDENCE, OHIO 44131
                                or at a different place if required by the Note Holder.
(B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $2,522.61                . This
amount may change.
(C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate
that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly
payment in accordance with Section 4 of this Note.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the  1st  day of
JUNE, 2012  , and the adjustable interest rate I will pay may change on that day every 12th
month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date
on which my adjustable interest rate could change, is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is
the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market
("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days
before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable
information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding  TWO  AND
750/1000                                             percentage points (     2.750 %) to the Current
Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point
(0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until
the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the
unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate
in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than     11.875 %
or less than   2.750 %. Thereafter, my adjustable interest rate will never be increased or decreased on any
single Change Date by more than  TWO  AND  000/1000                          percentage points
from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than
    11.875 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly
payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment
changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an
adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The
notice will include the amount of my monthly payment, any information required by law to be given to me and also
the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY ** See attached Prepayment Note Addendum.

I have the right to make payments of Principal at any time before they are due. A payment of Principal only
is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.
I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder
will use my Prepayments to reduce the amount of Principal I owe under this Note. However, the Note Holder
may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my
Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes
in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial

MULTISTATE FIXED/ADJUSTABLE RATE NOTE - WSJ One-Year LIBOR
Single Family - Fannie Mae MODIFIED INSTRUMENT
Form 3528  6/01                          Page 2 of 5

DocMagic *Docmail* 800-649-1362
www.docmagic.com

Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

### 6.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 7.   BORROWER'S FAILURE TO PAY AS REQUIRED

**(A)  Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of      15 calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be      5 . 000 % of my overdue payment of principal and interest.  I will pay this late charge promptly but only once on each late payment.

**(B)  Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)  Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount.  That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)  No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)  Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

### 8.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

### 9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that any one of us may be required to pay all of the amounts owed under this Note.

MULTISTATE  FIXED/ADJUSTABLE RATE NOTE - WSJ One-Year LIBOR
Single Family - Fannie Mae MODIFIED INSTRUMENT
Form 3528  6/01                                Page 3 of 5

DocMagic eFarms 800-649-1362
www.docmagic.com

⊃

## 10.  WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor.  "Presentment" means the right to require the Note Holder to demand payment of amounts due.  "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions read as follows:

(A)  Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B)  When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.  Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired

MULTISTATE  FIXED/ADJUSTABLE RATE NOTE - WSJ One-Year LIBOR
Single Family - Fannie Mae MODIFIED INSTRUMENT
Form 3528  6/01                                                    Page 4 of 5

DocMagic *DocMagic* 800-649-1362
www.docmagic.com

by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

Pay To The Order Of

Without Recourse
Indymac _ _ _ _ _ B.
By: _ _ _ _ _ _ _ _

_____ (Seal)          _____ (Seal)
MONROE ZEPHIR                    -Borrower   Betty A. Cotton                    -Borrower
                                             Assistant Vice President

_____ (Seal)          _____ (Seal)
                                 -Borrower                                     -Borrower

_____ (Seal)          _____ (Seal)
                                 -Borrower                                     -Borrower

[Sign Original Only]

MULTISTATE  FIXED/ADJUSTABLE RATE NOTE - WSJ One-Year LIBOR
Single Family - Fannie Mae MODIFIED INSTRUMENT
Form 3528  6/01                    Page 5 of 5

DocMagic €Rarms  800-649-1362
www.docmagic.com

## ADDENDUM TO ADJUSTABLE RATE NOTE
### (Prepayment)

Loan [redacted]

THIS ADDENDUM is made this   25th   day of  MAY  2007      , and is incorporated into and intended to form a part of the Note dated the same date as this Addendum.

1.     My right to make a Prepayment under Section 5 is modified by this Addendum.  A Prepayment of the entire unpaid principal balance is known as a "Full Prepayment."  A Prepayment of only part of the unpaid principal balance is known as a "Partial Prepayment."

2.     Except as provided below, I may make a Full Prepayment or a Partial Prepayment at any time without paying any Prepayment charge.  If within the first     THREE        (     3.0  /    ) year(s) I make a Full Prepayment or Partial Prepayment(s) of more than twenty percent (20%) of the original principal amount in any twelve (12) month period, I will pay a Prepayment charge in an amount equal to the payment of six (6) months' advance interest on the amount prepaid in excess of twenty percent (20%) of the original principal amount.

If I make a Partial Prepayment equal to one or more of my monthly payments, the due date of my next scheduled monthly payment may be advanced no more than one month.  If I make a Partial Prepayment in any other amount, I must still make all subsequent monthly payments as scheduled.

3.     All other provisions of the Note are unchanged by this Addendum and remain in full force and effect.

Dated:  5/25/07

_MONA ZEPHIR_                (Seal)                                            (Seal)
                          -Borrower                                          -Borrower

_____ (Seal)                           _____ (Seal)
                          -Borrower                                          -Borrower

_____ (Seal)                           _____ (Seal)
                          -Borrower                                          -Borrower

_____ (Seal)                           _____ (Seal)
                          -Borrower                                          -Borrower

Hard Prepayment Addendum - ARM
Non-Federally Exempted Sellers:
AL, AZ, CA, CO, CT, DE, FL, HI, ID, IL, IN, MT, ND,
NE, NH, NV, OK, SD, TN, UT, WA, WV,
AR (loan amounts greater than $130,000)
NY (1 year only and loan amounts greater than $250,000),
TX (interest rate cannot exceed 12%)

8480002 (0702)                          VMP Mortgage Solutions, INC

SPD #002
(02/07)



CERTIFIED COPY
OF ORIGINAL
DATE/INITIAL

*Loan Number* █████

## *ALLONGE TO NOTE*

*For Valuable Consideration,* the undersigned hereby endorses without recourse paid to the order

of **Indy Mac Bank, FSB.**

All of his/her rights, title and interest in and to the attached Note dated *May 25, 2007* in the amount of *$384,000.00.*

The Borrower(s) in said Note are:

**Mona Zephir.**

Said Note is secured by a Mortgage/Deed of Trust of the same date on real property located at

*20717 Sparta Court, Olympia Fields, Illinois 60461.*

Signed and dated *May 25, 2007.*

*First Ohio Banc and Lending, Inc.*

**Brian Novak**
**Director of Correspondent Lending**

Pay To The Order Of

Without Recourse
IndyMac Bank, F.S.B.
By:

Betty A. Cotton
Assistant Vice President

Doc#: 1603349133 Fee: $68.00
Karen A. Yarbrough
Cook County Recorder of Deeds
Date: 02/02/2016 10:59 AM Pg: 1 of 11

**Requested By and**
**When Recorded Return To:**
**Loan Modification Solutions**
**3220 El Camino Real**
**Irvine, CA 92602**
**(800) 323-0165**

Residential Credit Solutions, Inc. (RCS)
4708 Mercantile Dr., Fort Worth, TX 76137
Attn: Final Documents
Tax/Map/Parcel ID No.
This Instrument was prepared by:
Kouya Cline
4282 North Freeway, Fort Worth, TX 76137
800-737-1192

[Space Above This Line For Recording Data]

Investor Loan Number: ███████ Investor Number: Borrower: ZEPHIR

## MODIFICATION AGREEMENT

Borrower ("I"): MONA ZEPHIR, A SINGLE WOMAN whose address is 20717 SPARTA CT,
OLYMPIA FIELDS, IL 60461 and whose phone number is ("Borrower").
If there is more than one Borrower or Mortgagor executing this document, each is referred to as "I." For purposes of this document
words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

Lender or Servicer ("Lender"): Residential Credit Solutions, Inc. (RCS) a Delaware Corporation    for
FIRST OHIO BANC & LENDING, INC., OHIO OHIO BANKING CORPORATION whose address is
4708 Mercantile Dr., Fort Worth, TX 76137 and whose phone number is 800-737-1192.

Date of first lien mortgage, deed of trust, or security deed ("Mortgage") recorded in Book or Liber
Instrument: 0717140047 , of the Cook County Recorder of Deeds Records of COOK County,
ILLINOIS and Note ("Note"): May 25, 2007

Loan Number: ████████
Property Address ("Property"): 20717 SPARTA CT, OLYMPIA FIELDS, ILLINOIS 60461

See Exhibit 'A' attached hereto and made a part hereof for all purposes.

If my representations in Section 1 continue to be true in all material respects, then this Modification
Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the
Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may
previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this
Agreement and not defined have the meaning given to them in Loan Documents.

Loan Modification Agreement - Single Family- Modified Instrumen███████
SigniaDocs, Inc. 2010

I understand that after I sign and return two copies of this Agreement to the Lender, the Lender will send me a signed copy of this Agreement. If submitted electronically, please follow the agreed-upon e-process. Make sure to keep a copy for your records. This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

1.    **My Representations.**    I certify, represent to Lender and agree:

   A.    I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

   B.    Property Type:  Single Family.

   C.    There has been no change in the ownership of the Property since I signed the Loan Documents;

   D.    I have provided documentation for all income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Modification program ("Program"));

   E.    Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;

   F.    If Lender requires me to obtain credit counseling in connection with the Program, I will do so; and

   G.    I have made or will make all payments required under a Trial Period Plan or Loan Workout Plan.

2.    **Acknowledgements and Preconditions to Modification.**   I understand and acknowledge that:

   A.    If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that any of my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Agreement will terminate. In that event, the Lender will have all of the rights and remedies provided by the Loan Documents; and

   B.    I understand that the Loan Documents will not be modified unless and until (i) the Lender accepts this Agreement by signing and returning a copy of it to me, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

3.    **The Modification.** If my representations in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on December 1, 2015 (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. I understand that if I have failed to make any payments as a precondition to this modification under a workout plan or trial period plan, this modification will not take effect. The first modified payment will be due on December 1, 2015.

A.    The new Maturity Date will be: November 1, 2055.

B.    The modified Principal balance of my Note will include all amounts and arrearages that
will be past due as of the Modification Effective Date (including unpaid and deferred
interest, fees, escrow advances and other costs, but excluding unpaid late charges,
collectively, "Unpaid Amounts") less any amounts paid to Lender but not previously
credited to my Loan. The new Principal balance of my Note will be $510,088.78 (the
'New Principal Balance'). I understand that by agreeing to add the Unpaid Amounts to the
outstanding principal balance, the added Unpaid Amounts accrue interest based on the
interest rate in effect under this Agreement. I also understand that this means interest will
now accrue on the unpaid Interest that is added to the outstanding principal balance,
which would not happen without this Agreement.

C.    $153,000.00 of the New Principal Balance shall be deferred (the 'Deferred Principal
Balance') and I will not pay interest or make monthly payments on this amount. The New
Principal Balance less the Deferred Principal Balance shall be referred to as the 'Interest
Bearing Principal Balance' and this amount is $357,088.78. Interest at the rate of 2.000%
will begin to accrue on the Interest Bearing Principal Balance as of 11/1/2015 and the
first new monthly payment on the Interest Bearing Principal Balance will be due on
12/1/2015. My payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly P&I Payment Amount | Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|-------|---------------|---------------------------|----------------------------|-------------------------------|------------------------|-------------------|----------------------------|
| 1-40  | 2.000%        | 11/1/2015                 | $1,081.36                  | $929.39                       | $2,010.75              | 12/01/2015        | 480                        |

*The escrow payments may be adjusted periodically in accordance with applicable law
and therefore my total monthly payment may change accordingly.

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the
Loan Documents, including but not limited to, provisions for an adjustable or step
interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification,
the minimum monthly payment option, the interest-only or any other payment options
will no longer be offered and that the monthly payments described in the above payment
schedule for my modified loan will be the minimum payment that will be due each month
for the remaining term of the loan. My modified loan will not have a negative
amortization feature that would allow me to pay less than the interest due resulting in any
unpaid interest to be added to the outstanding principal balance.

D.    I will be in default if I do not comply with the terms of the Loan Documents, as modified
by this Agreement.

E.    If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

F.    I agree to pay in full the Deferred Principal Balance and any other amounts still owed under the Loan Documents by the earliest of: (i) the date I sell or transfer an interest in the Property, (ii) the date I pay the entire Interest Bearing Principal Balance, or (iii) the new Maturity Date.

G.    If I make a partial prepayment of Principal, the Lender may apply that partial prepayment first to any Deferred Principal Balance before applying such partial prepayment to other amounts due.

4.    **Additional Agreements**. I agree to the following:

A.    That all persons who signed the Loan Documents or their authorized representative (s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

B.    That this Agreement shall supersede the terms of any modification, forbearance, Trial Period Plan or Workout Plan that I previously entered into with Lender.

C.    To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D.    Funds for Escrow Items. I will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." I shall promptly furnish to Lender all notices of amounts to be paid under this Section 4.D. I shall pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items.

Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.

My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Lender any such amount.   Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Lender all Funds, and in such amounts, that are then required under this Section 4.D.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay me any interest or earnings on the Funds. Lender and I can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to me any Funds held by Lender.

E.    That the Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

F.    That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

Loan Modification Agreement - Single Family- Modified Instrument
SigmaDocs, Inc. 2010

G.    That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, I agree as follows: If all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, Lender shall not exercise this option if federal law prohibits the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

H.    That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any circumstance, to assume the Loan. Except as noted herein, this Agreement may not, under any circumstances, be assigned to, or assumed by, a buyer of the Property.

I.    That, as of the Modification Effective Date, if any provision in the Note or in any addendum or amendment to the Note allowed for the assessment of a penalty for full or partial prepayment of the Note, such provision is null and void.

J.    That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product (s), and/ or subordination agreement (s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage loan is in first lien position and/ or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement (s), title insurance product (s) and/ or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

K.    That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that a corrected Agreement will be provided to me and this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrected Agreement, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Modification program.

L.    Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS. In cases where the loan has been registered with MERS who has only legal title to the interests granted by the borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage loan.

M.    That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income,

payment history, government monitoring information, and information about account balances and activity. In addition, I understand and consent to the disclosure of my personal information and the terms of the Trial Period Plan and this Modification Agreement by Lender to (a) the U.S. Department of the Treasury; (b) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); and (c) any HUD certified housing counselor.

N.    I agree that if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the original promissory note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the original note. All documents the Lender requests of me under this Section 4.N. shall be referred to as "Documents." I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

O.    That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the capitalization which will result in a higher total monthly payment. Furthermore, the date on which I may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

P.    If my Loan Documents govern a home equity loan or line of credit, then I agree that as of the Modification Effective Date, I am terminating my right to borrow new funds under my home equity loan or line of credit. This means that I cannot obtain additional advances, and must make payments according to this Agreement. (Lender may have previously terminated or suspended my right to obtain additional advances under my home equity loan or line of credit, and if so, I confirm and acknowledge that no additional advances may be obtained.)

In Witness Whereof, the Lender and I have executed this
Agreement.

Residential Credit Solutions, Inc. (RCS)

By _____ (Seal)
Name: KOUYA CLINE
Its: Assistant Vice President - Servicing
Date: 12-24-15

_____ (Seal)  Date: 12/16/15
MONA ZEPHIR

Loan Modification Agreement - Single Family- Modified Instrument
SigniaDocs, Inc. 2010
Residential Credit Solutions, Inc. (RCS)
NMLS ID# 1514

## UNIFORM, ALL PURPOSE CERTIFICATE OF ACKNOWLEDGMENT

State of Texas
County of Tarrant

On the 30ᵗʰ day of December in the year of 2015 before me, the undersigned, personally appeared Kouya Cline, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed same in his/her/their capacity(ies) and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in Fort Worth, Texas.

Notary Public  Stacy Dobson

    STACY DOBSON
  MY COMMISSION EXPIRES
   AUGUST 18, 2019
  NOTARY ID: 128713409

My Commission Expires:  August 18, 2019

_____ [Space Below This Line For Acknowledgment] _____

State of ILLINOIS
County of _____COOK_____

The foregoing instrument was acknowledged before me this 17th day of _December_ 2015 by MONA
ZEPHIR, A SINGLE WOMAN.

[Seal]

OFFICIAL SEAL
JASMINE JACKSON
Notary Public - State of Illinois
My Commission Expires Sep 10, 2017

Notary Public

Jasmine Jackson
Printed Name

Title or rank: Personal Banker

Serial number, if any: W1A

My commission expires on: Sept 10, 2017

EXHIBIT A

LEGAL DESCRIPTION

Legal Description:  LOT 12 IN BLOCK 7 IN ATHENIA PARK, BEING A SUBDIVISION IN THE NORTHEAST 1/4 OF SECTION
24, TOWNSHIP 35 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN ACCORDING TO THE PLAT THEREOF
RECORDED OCTOBER 23, 1956, AS DOCUMENT 16734380, IN COOK COUNTY, ILLINOIS.

Permanent Index #'s: ███████████████

Property Address: 20717 Sparta Court, Olympia Fields, Illinois 60461

Doc#: 1506846151 Fee: $50.00
Date: 02/20/2015 08:45 AM Pg: 1 of 2
Cook County Recorder of Deeds
*RHSP:$9.00 RPRF:$1.00 FEES Applied

Recording Requested By:
OCWEN LOAN SERVICING, LLC

OCWEN LOAN SERVICING, LLC
5720 PREMIER PARK DRIVE
WEST PALM BEACH, FL 33407

Record and Return to:
Pierce and Associates
1 N. Dearborn St., Fl 13
Chicago, IL 60602-4312
PB#

## CORPORATE ASSIGNMENT OF MORTGAGE

Cook, Illinois
SELLER'S SERVICING █████████ "ZEPHIR"
SELLER'S LENDER ID #
OLD SERVICING #
Date of Assignment:        FEB 2 6 2015
Assignor: FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC BANK F.S.B. at
c/o 155 N Lake Ave, Pasadena, CA 91101
Assignee: OCWEN LOAN SERVICING, LLC at 1661 Worthington Road, Suite 100, West Palm Beach, FL 33409

Executed By: MONA ZEPHIR, A SINGLE WOMAN  To: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
("MERS"), SOLELY AS NOMINEE FOR FIRST OHIO BANC & LENDING, INC. ITS SUCCESSORS AND/OR
ASSIGNS
Date of Mortgage: 05/25/2007 Recorded: 06/20/2007 in Book/Reel/Liber: N/A Page/Folio: N/A as Instrument No.:
0717140047 In the County of Cook, State of Illinois.

Assessor's/Tax ID No.

Property Address: 20717 SPARTA COURT, OLYMPIA FIELDS, IL 60461

Legal: LOT 12 IN BLOCK 7 IN ATHENIA PARK, BEING A SUBDIVISION IN THE NORTHEAST 1/4 OF SECTION 24,
TOWNSHIP 35 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN ACCORDING TO THE PLAT
THEREOF RECORDED OCTOBER 23, 1956, AS DOCUMENT 16734380, IN COOK COUNTY, ILLINOIS.

KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of
which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage
having an original principal sum of $384,000.00 with interest, secured thereby, and the full benefit of all the powers and of
all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said
Assignee, the Assignor's interest under the Mortgage.

TO HAVE AND TO HOLD the said Mortgage, and the said property unto the said Assignee forever, subject to the
terms contained in said Mortgage.

*ASI*ASIGMAC *02/11/2015 10:05:29 AM* GMAC40GMAC ████████████             LSTATE_MORT_ASSIGN_ASSN *LCB*LCBGMAC*

CORPORATE ASSIGNMENT OF MORTGAGE **Page 2 of 2**

FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC BANK F.S.B.
On ___ FEB 2 6/2015

This assignment is made without recourse, representation
or warranty, express or implied, by the FDIC in its
corporate capacity or as Receiver.

By: _____
     **Mike Stanford**
     Attorney In Fact

STATE OF _____ Texas
COUNTY OF _____ Travis

On FEB 2 6 2015 , before me, ____ **Lucia C. Castro** ____ , a Notary Public in and for ____ **Travis** ____ in
the State of ____ **Texas** ____ , personally appeared ____ **Mike Stanford** ____ , personally known to me (or
proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that
by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal,

_____
Lucia C. Castro
Notary Expires:  SEP 2 7 2015

LUCIA C CASTRO
My Commission Expires
September 27, 2015

(This area for notarial seal)

Prepared By:
Laura Chiusano-brewster,  OCWEN LOAN SERVICING, LLC 5720 PREMIER PARK DRIVE, WEST PALM BEACH, FL  33407
800-746-2936

*ASI*ASIGMAC*02/11/2015 10:05:29 AM* GMAC40GMAC ███████████████ STATE_MORT_ASSIGN_ASSN *LCB*LCBGMAC*

Case 19-11581    Doc 11-3    Filed 05/09/19    Entered 05/09/19 18:21:58    Desc Loan

Doc#: 1506846151 fee: $50.00
Date: 05/05/2015 08:45 AM Pg: 1 of 2
Cook County Recorder of Deeds
*RHSP:$9.00 RPRF:$1.00 FEES Applied

Recording Requested By:
OCWEN LOAN SERVICING, LLC

OCWEN LOAN SERVICING, LLC
5720 PREMIER PARK DRIVE
WEST PALM BEACH, FL 33407

Record and Return to:
Pierce and Associates
1 N. Dearborn St., Fl 13
Chicago, IL 60602-4312
PB#

## CORPORATE ASSIGNMENT OF MORTGAGE

Cook, Illinois
SELLER'S SERVICING ████████ "ZEPHIR"
SELLER'S LENDER ID#
OLD SERVICING #
Date of Assignment:    FEB 2 6 2015
Assignor: FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC BANK F.S.B. at
c/o 155 N Lake Ave, Pasadena, CA 91101
Assignee: OCWEN LOAN SERVICING, LLC at 1661 Worthington Road, Suite 100, West Palm Beach, FL 33409

Executed By: MONA ZEPHIR, A SINGLE WOMAN  To: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
("MERS"), SOLELY AS NOMINEE FOR FIRST OHIO BANC & LENDING, INC. ITS SUCCESSORS AND/OR
ASSIGNS
Date of Mortgage: 05/25/2007 Recorded: 06/20/2007 in Book/Reel/Liber: N/A Page/Folio: N/A as Instrument No.:
0717140047 In the County of Cook, State of Illinois.

Assessor's/Tax ID No.

Property Address: 20717 SPARTA COURT, OLYMPIA FIELDS, IL  60461

Legal: LOT 12 IN BLOCK 7 IN ATHENIA PARK, BEING A SUBDIVISION IN THE NORTHEAST 1/4 OF SECTION 24,
TOWNSHIP 35 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN ACCORDING TO THE PLAT
THEREOF RECORDED OCTOBER 23, 1956, AS DOCUMENT 16734380, IN COOK COUNTY, ILLINOIS.

KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of
which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage
having an original principal sum of $384,000.00 with interest, secured thereby, and the full benefit of all the powers and of
all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said
Assignee, the Assignor's interest under the Mortgage.

TO HAVE AND TO HOLD the said Mortgage, and the said property unto the said Assignee forever, subject to the
terms contained in said Mortgage.

*ASI*ASIGMAC *02/11/2015 10:05:29 AM* GMAC40GMAC ████████ LSTATE_MORT_ASSIGN_ASSN *LCB*LCBGMAC*

CORPORATE ASSIGNMENT OF MORTGAGE Page 2 of 2

FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC BANK F.S.B.
On    FEB 26 2015

This assignment is made without recourse, representation or warranty, express or implied, by the FDIC in its corporate capacity or as Receiver.

By: _____
            Mike Stanford
        Attorney In Fact

STATE OF _____ Texas
COUNTY OF _____ Travis

On  FEB 26 2015 , before me,    Lucia C. Castro            , a Notary Public in and for      Travis      in
the State of _____ Texas ___, personally appeared    Mike Stanford    , personally known to me (or
proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that
by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal,

_____
Lucia C. Castro
Notary Expires:  SEP 27 2015

LUCIA C CASTRO
My Commission Expires
September 27, 2015

(This area for notarial seal)

Prepared By:
Laura Chiusano-brewster, OCWEN LOAN SERVICING, LLC 5720 PREMIER PARK DRIVE, WEST PALM BEACH, FL 33407
800-746-2936

*ASI*ASIGMAC*02/11/2015 10:05:29 AM* GMAC40GMAC█████████████████STATE_MORT_ASSIGN_ASSN *LCB*LCBGMAC*

**When Recorded Return To:**
Ditech Financial LLC
C/O Nationwide Title Clearing, Inc.
2100 Alt. 19 North
Palm Harbor, FL 34683

Ditech Loan Number ▮▮▮▮
RCS Loan Number ▮▮▮▮
Custodian Ref # ▮▮▮▮

Doc# 1619357129 Fee: $50.00
Karen A. Yarbrough
Cook County Recorder of Deeds
Date: 07/11/2016 11:26 AM Pg: 1 of 1

## ASSIGNMENT OF MORTGAGE

**FOR GOOD AND VALUABLE CONSIDERATION,** the sufficiency of which is hereby acknowledged, the undersigned, **RESIDENTIAL CREDIT SOLUTIONS, INC., WHOSE ADDRESS IS 7360 SOUTH KYRENE ROAD, T-314, TEMPE, AZ 85283, (ASSIGNOR),** by these presents does convey, grant, assign, transfer and set over the described Mortgage with all interest secured thereby, all liens, and any rights due or to become due thereon to **DITECH FINANCIAL LLC, A DELAWARE LIMITED LIABILITY COMPANY, WHOSE ADDRESS IS 7360 SOUTH KYRENE ROAD, T-314, TEMPE, AZ 85283 (800)315-8733, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE).**

Said Mortgage is dated 05/25/2007, and made by **MONA ZEPHIR** to **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FIRST OHIO BANC & LENDING, INC., ITS SUCCESSORS AND ASSIGNS** and recorded 06/20/2007 in the records of the Recorder or Registrar of Titles of **COOK** County, **Illinois**, in **Document # 0717140047**.

Upon the property situated in said State and County as more fully described in said Mortgage or herein to wit:
  LOT 12 IN BLOCK 7 IN ATHENIA PARK, BEING A SUBDIVISION IN THE NORTHEAST 1/4 OF SECTION 24, TOWNSHIP 35 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN ACCORDING TO THE PLAT THEREOF RECORDED OCTOBER 23, 1956 AS DOCUMENT 16734380, IN COOK COUNTY, ILLINOIS.

Tax Code/PIN ▮▮▮▮

Modification: DATE: 11/22/2008 REC DATE: 01/14/2009 INSTR# 0901457220 Modification: DATE: 12/16/2015 REC DATE: 02/02/2016 INSTR# 1603349133.

Property is commonly known as: 20717 SPARTA COURT, OLYMPIA FIELDS, IL 60461.

**Dated this 08th day of July in the year 2016**
**RESIDENTIAL CREDIT SOLUTIONS, INC., by DITECH FINANCIAL LLC, its Attorney-in-Fact**

**JESSICA BARRERES**
**VICE PRESIDENT**

All persons whose signatures appear above are employed by NTC, have qualified authority to sign and have reviewed this document and supporting documentation prior to signing.

STATE OF FLORIDA      COUNTY OF PINELLAS
The foregoing instrument was acknowledged before me on this 08th day of July in the year 2016, by Jessica Barreres as VICE PRESIDENT of DITECH FINANCIAL LLC as Attorney-in-Fact for RESIDENTIAL CREDIT SOLUTIONS, INC., who, as such VICE PRESIDENT being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

**CYNTHIA ALBANO - NOTARY PUBLIC**
**COMM EXPIRES: 08/01/2016**

Cynthia Albano
Notary Public State of Florida
My Commission # EE 221270
Expires August 1, 2016

**Document Prepared By: E.Lance/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152**

NAME:  ZEPHIR, MONA
Loan#:  ▓▓▓▓▓▓▓▓

### ASSIGNMENT OF
### MORTGAGE

**BOX 178**

Doc#:  0813505131 Fee: $38.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 05/14/2008 11:23 AM Pg: 1 of 2

For and in consideration of Ten
Dollars ($10.00) and other value
received, Mortgage Electronic
Registration Systems, Inc.,
M.E.R.S., INC. AS NOMINEE FOR FIRST
OHIO BANC & LENDING, INC., its
successors and/or assigns
(hereinafter M.E.R.S., INC.), does
hereby assign, transfer, convey
without warranties and without
recourse; set over and deliver to
INDYMAC BANK, F.S.B.. (hereinafter
called the Assignee), its successors
and assigns, on 01/04/08, the
following described mortgage:

Date:  __May 25, 2007__    Amount of Debt: $ _384,000.00_
Mortgagor: _____MONA ZEPHIR;
Mortgagee: _M.E.R.S., INC. AS NOMINEE FOR FIRST OHIO BANC & LENDING, INC., its_
          _successors and/or assigns_
Recorded on __June 20, 2007__    As Document _0717140047_ In the Office of the
Recorder/Registrar of COOK County, Illinois, and described as follows:

> LOT 12 IN BLOCK 7 IN ATHENIA PARK, BEING A SUBDIVISION IN
> THE NORTHEAST 1/4 OF SECTION 24, TOWNSHIP 35 NORTH, RANGE 13
> EAST OF THE THIRD PRINCIPAL MERIDIAN ACCORDING TO THE PLAT
> THEREOF RECORDED OCTOBER 23, 1956, AS DOCUMENT 16734380, IN
> COOK COUNTY, ILLINOIS.

> Permanent Real Estate Tax Number ▓▓▓▓▓▓▓
> Commonly known as:  20717 SPARTA COURT, OLYMPIA FIELDS, IL 60461

<u>Together</u> with all rights and interest in the same and the premises therein
described and the note or obligation thereby secured.

<u>To have and to Hold</u> the same unto the Assignee, its successors and assigns
forever.

This assignment is made without recourse and without representation or warranty by
Assignor, express or implied.

                                    MORTGAGE ELECTRONIC REGISTRATION
                                        SYSTEMS, INC. ("MERS")

                              By: _____
                                    Certifying Officer  Laura Hescott  VP

                              By: _____
                                    Certifying Officer  Christina Allen  VP

State of  MN )
County of  Dukuth  ss.

     The Undersigned, a Notary Public in and for above-said County and State,
does hereby acknowledge that ___Laura Hescott___ and ___Christina Allen___, Certifying
Officers for MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. personally appeared
before me this day, and being by me duly sworn, says that s/he, being informed of

INDY

the contents, voluntarily executed the foregoing and annexed instrument for and on behalf of such entity.

(Notary Seal)

_____
Notary Public

Prepared by & RETURN TO:



Pierce & Associates, P.C.
1 N. Dearborn
Suite 1300
Chicago, IL 60602
PB#
INDY
Attention:

INDY

When Recorded Return To:
**Ditech Financial LLC**
**C/O Nationwide Title Clearing, Inc.**
**2100 Alt. 19 North**
**Palm Harbor, FL 34683**

Prior ▮▮▮▮▮▮▮
Custodian ▮▮▮▮▮▮▮

Doc#. 1733546039 Fee: $50.00
Karen A.Yarbrough
Cook County Recorder of Deeds
Date: 12/01/2017 09:16 AM Pg: 1 of 1

## ASSIGNMENT OF MORTGAGE

**FOR GOOD AND VALUABLE CONSIDERATION**, the sufficiency of which is hereby acknowledged, the undersigned, **DITECH FINANCIAL LLC, WHOSE ADDRESS IS 2100 E. ELLIOT RD., TEMPE, AZ 85284, (ASSIGNOR)**, by these presents does convey, grant, assign, transfer and set over the described Mortgage with all interest secured thereby, all liens, and any rights due or to become due thereon to **SPECIALIZED LOAN SERVICING, LLC, WHOSE ADDRESS IS 8742 LUCENT BLVD, STE 300, HIGHLANDS RANCH, CO 80129, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE)**.

Said Mortgage is dated 05/25/2007, and made by **MONA ZEPHIR** to **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR FIRST OHIO BANC & LENDING, INC., ITS SUCCESSORS AND ASSIGNS** and recorded 06/20/2007 in the records of the Recorder or Registrar of Titles of **COOK** County, **Illinois**, in **Document # 0717140047**.

Upon the property situated in said State and County as more fully described in said Mortgage or herein to wit:
    LOT 12 IN BLOCK 7 IN ATHENIA PARK, BEING A SUBDIVISION IN THE NORTHEAST 1/4 OF SECTION 24, TOWNSHIP 35 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN ACCORDING TO THE PLAT THEREOF RECORDED OCTOBER 23, 1956, AS DOCUMENT 16734380, IN COOK COUNTY, ILLINOIS.

Tax Code/PIN ▮▮▮▮▮▮▮

Modification: 01/14/2009 INST: 0901457220 Modification: 02/02/2016 INST: 1603349133.

Property is commonly known as: 20717 SPARTA COURT, OLYMPIA FIELDS, IL 60461.

**Dated this 30th day of November in the year 2017**
**DITECH FINANCIAL LLC**


**JENNIFER MOYLAN**
**VICE PRESIDENT**

All persons whose signatures appear above are employed by NTC, have qualified authority to sign and have reviewed this document and supporting documentation prior to signing.

STATE OF FLORIDA        COUNTY OF PINELLAS
The foregoing instrument was acknowledged before me on this 30th day of November in the year 2017, by Jennifer Moylan as VICE PRESIDENT of DITECH FINANCIAL LLC, who, as such VICE PRESIDENT being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.


**NICOLE SHIELDS**
**COMM EXPIRES: 08/05/2020**

NICOLE SHIELDS
Notary Public – State of Florida
My Comm. Expires August 5, 2020
Commission # GG126925

**Document Prepared By: D.Larose/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152**
▮▮▮▮▮▮▮MERS PHONE 1-888-679-6377 MERS Mailing Address: P.O. Box
▮▮▮▮ Flint, MI 48501-2026 DOCR T:20171108-38-56 [C-11] FERMIL1